IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PURDUE PHARMA LP., PURDUE PHARMACEUTICALS LP., THE P.F. LABORATORIES, INC., RHODES TECHNOLOGIES and GRÜNENTHAL GMBH,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS, LLC,<br><br>Defendant. | C.A. No. 15-1152-SLR<br>(consolidated with<br>C.A. No. 15-831-SLR-SRF) |

**DECLARATION OF RUSS SOMMA, Ph.D. IN SUPPORT OF DEFENDANT AMNEAL'S OPENING CLAIM CONSTRUCTION BRIEF**

I, Russ Somma, declare that:

DECLARATION OF RUSS SOMMA, Ph.D.

I.   **Introduction**

1.   I am a United States citizen and resident of New Jersey.

2.   I have been retained by Ciresi Conlin and Budd Larner ("counsel") to provide my opinions in the field of pharmaceutical formulation for purposes of the above-captioned litigation. I have read and understand U.S. Patent Nos. 8,808,741, 8,894,987, and 8,894,988. I have read and understand the prosecution histories for these patents, and

reviewed other material.  I have also reviewed the Declaration of Stanley Davis, Ph.D

offered by Plaintiffs in support of Plaintiffs claim construction positions and plaintiffs'

claim construction brief and exhibits.

3.  I understand that Plaintiffs assert the '741, '987 and '988 patents against Amneal's

generic version of extended release OxyContin.  Amneal will offer products in 10, 15, 20,

30, 40, 60, and 80 mg.  Plaintiffs assert infringement of the following claims:

    a.  '741 patent: claims 1, 2, 4-10, 17, and 20-27.

    b.  '987 patent: claims 1-7, 9-12, 15, 25, 27, 31-33, 36-46, 49, 54-57, 59-61, 64, and

       65.

    c.  '988 patent: claims 1, 2, 4-8, and 15-26.

4.  I am being compensated for my time in an amount consistent with my customary

consulting fee, and my compensation is not contingent on my opinion or the outcome of

this case.

5.  I reserve the right to supplement my opinions as needed based on new information

provided.

## II.    My Background, Formulation Experience, and Qualifications

6.  I am the President of SommaTech a pharmaceutical consulting firm that specializes in

numerous aspects of drug development including pharmaceutics and pharmaceutical

technology.  SommaTech offers a range of services to the pharmaceutical industry

including expert insight into production, troubleshooting, product validation, technology

transfer and formulation development.  In addition, SommaTech advises pharmaceutical

companies on issues relating to regulatory, quality assurance and CMC support from submission through pre-approval inspection.

7. I have over 40 years of experience in formulating pharmaceuticals, including extended release and the use of various polymeric materials to provide the required sustained release effect. My career has been focused on bringing products to market efficiently using my knowledge of oral solid dosage forms.

8. I obtained my BS in Pharmacy at Rutgers University in 1974.  I obtained my MS in pharmaceutical science from Rutgers University in 1980 and I obtained my Ph.D. in pharmaceutical science from Rutgers University in 1987.

9. I have a particular technical interest in the area of oral solid dosage forms and the associated physical pharmacy. The majority of my experience was gained during my tenure at Novartis.

10. I began my career at Novartis (then Ciba-Geigy) in 1975 as a scientist in the solid oral development area. During the ensuing years I held positions of growing responsibility leading to Director and Technical Project Leader in 2001, a position which I held until I resigned to begin SommaTech in 2004. During my tenure I was involved in 21 successful new drug applications and worked on dozens of new drug formulations.

   a.  Novel solid oral delivery system was approved by the FDA during June 2001 with a line extension approval in April 2004. The product has also been approved in 13 Rest of World countries.
   b.  A fixed combination product has been approved by the FDA contributing to the life cycle of the cardiovascular product.
   c.  A pediatric extension strategy has been implemented for application in support of an anti-viral product as well as in support of the cardiovascular product franchise.
   d.  Additional projects included 4 NCEs in late phase development that were targeted for process introduction at offshore locations. These sites included third-party contractors as well as Novartis assets within the EU.

   e.  Led a multi-functional team with technical responsibility for a novel solid oral delivery system. The product was planned for global marketing position. External budget is 18 million dollars for contractor services through launch.

   f.  Implemented SUPAC IR/MR equipment guidance with society associates and colleagues within FDA/CDER.

   g.  Introduced a major NSAID into Puerto Rico with subsequent approval and launch.

11. This is a list of my publications and patents.

L. Lee, R. Somma, et al.," In vitro dissolution and in vivo oral absorption of methylphenidate from a bimodal release formulation in healthy volunteers," Biopharmaceutics and Drug Disposition, (25) 2,91 (2004)

J.Bara and R.Somma "Influence of the Physicochemical Variability of Magnesium Stearate on Its Lubricant Properties: Possible Solutions," Drug Dev. And Ind. Pharmacy, 22 (11), 1105 (1996)

R. Somma, "Tensile Strength of Fatty Alcohol Sustained Release Matrices as a Function of Heat of Freezing," Pharm. Res., 2 (1987) S-53

R.Somma, "Proceedings of the Sixth Wisconsin Update Conference, Tabletting" (1987) Overview of Tablet Compression Physics, p.7

R.Somma, "Hardness Effects Due To Aging and Dwell Time During Compression of Fatty Alcohol Compacts and Their Excipients" (1987) Rutgers University, Ph.D. Thesis

Y. Joshi, R. Somma US Patent Application Publication US2002/0187192A1 "Pharmaceutical Composition Which Reduces Or Eliminates Drug Abuse Potential"

Y. Joshi, R. Somma US Patent Application Publication US2003/0049272A1 "Pharmaceutical Composition Which Produces Irritation"

W. Howard, R. Somma US Patent US 8,617,602 B2 "Immediate Release Compositions and Methods for Delivering Drug Formulations Using Weak Acid Ion Exchange Resins in Abnormally High pH Environments"

W. Howard, R. Somma US Patent US 9,211,292 B2 "Preventing or Reducing Drug Abuse and Overdose Events"

W. Howard, R. Somma US Patent Application Publication US2014/0079662A1 "Compositions and Methods for Treating Respiratory Disorders with Doxofilline"

W. Howard, R. Somma US Patent US 8,357,398 B2 "Benzonatate Compositions and Methods of Use"

W. Howard, R. Somma US Patent Application Publication "Immediate Release Compositions and Methods for Delivering Drug Formulations Using Strong Ion Exchange Resins"

III.   **A Person of Ordinary Skill In The Art & Effective Filing Date**

12. I understand from counsel that patents are read and interpreted in light of the knowledge of a person of ordinary skill (POSA) in the art as of the earliest effective filing date of the patent. I understand that Purdue claims that each of these patents is entitled to an effective filing date as of the date the provisional application was filed. The filing date for Provisional Application No. 60/844,872 is August 25, 2006.

13. I understand from counsel that POSA is a hypothetical person deemed to be aware of all relevant prior art.

14. I understand from counsel that Amneal proposed the following definition of POSA in its interrogatory answers:

   a. "One of ordinary skill in the art would have a Ph.D., Pharm.D, or M.D. degree in a relevant field (such as polymer chemistry, pharmaceuticals, pharmaceutical chemistry, pharmaceutical formulation, chemical engineering or materials science, pharmacy, pharmaceutical science, pharmaceuticals, medical chemistry, chemical engineering, or medicine) with at least three years of post-doctoral experience in those fields, or a Master's degree in said field with at least six years of experience, particularly experience with controlled-release formulations or formulation of drugs with potential for abuse."

15. Based on my understanding of the technology, education and experience levels of those routinely working in the area of the patents, I agree with this standard. As of the relevant date of August 2006, I was a POSA.

IV.     **Claim Construction**

16. I understand that the Court construes the meaning of certain claim terms using the language of the patent claims, the specification, and the prosecution history as primary references. I understand that the parties have proposed terms to be construed.

17. My opinion concerns three patents: U.S. Patent Nos. 8,808,741, 8,894,987, and 8,894,988.  These patents have terms to be construed that relate to calculation of "at least one" polyethylene oxide ("PEO") having a "molecular weight of approximately 4,000,000."  These claim terms are:

    a.  "at least one polyethylene oxide, based on rheological measurements, has a molecular weight of approximately 4,000,000."

    b.  "at least one polyethylene oxide has, based on rheological measurements, a molecular weight of approximately 4,000,000."

    c.  "at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of 4,000,000."

18. Claim 1 of the '741 patent is directed to a method of treating pain by administering a convection cured tablet having an extended release matrix that is comprised of the listed ingredients.

19. Claim 1 of the '741 patent is copied below with the terms at issue highlighted in yellow:

The invention claimed is:

1.   A method of treating pain comprising administering to a patient in need thereof a convection cured shaped table comprising an extended release matrix comprising a composition, wherein said tablet comprises:
     (1) at least one polyethylene oxide having, based on rheo-

logical measurements, an approximate molecular weight of 4,000,000, and

(2) oxycodone or a pharmaceutically acceptable salt, and wherein said table is prepared by a process comprising the steps of:

    (a) combining at least (1) and (2) to form a blend;

    (b) shaping said blend to form a shaped tablet; and

    (c) convection curing said shaped tablet by subjecting the shaped tablet to a temperature from about 60 to about 90° C. for a time of from about 15 minutes to about 10 hours, wherein said

wherein said convection cured shaped tablet comprises:

    (i) 5, 7.5, 10, 15, 20, or 30 mg of said oxycodone or pharmaceutically acceptable salt and at least 79% by weight, based upon the total weight of said composition, of said at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of 4,000,000;

    (ii) 40 mg of said oxycodone or pharmaceutically acceptable salt and at least 72% by weight, based upon the total weight of said composition, of said at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of 4,000,000;

    (iii) 60 mg of said oxycodone or pharmaceutically acceptable salt and at least 57% by weight, based upon the total weight of said composition, of said at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of 4,000,000; or

    (iv) 80 mg of said oxycodone or pharmaceutically acceptable salt and at least 54% by weight, based upon the total weight of said composition, of said at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of 4,000,000.

20. All of the asserted claims similarly use the disputed claim term.

21. I understand that Amneal has proposed the following constructions for the same disputed term: "one or more polyethylene oxide ingredients each supplied in a grade having a molecular weight of approximately 4,000,000 based on rheological measurements."

22. Reading the claims in context of the claims overall, the specification, prosecution history, and based on the normal usage of the terms to POSA, in my opinion Amneal's construction is accurate and supported by the primary resources.

23. **General background on PEO:** PEO is known to be hydrophilic, which means it is water "loving". PEO reacts with water and forms a gel, which as noted is shear-thinning. Dr. Davis' general scientific explanation of PEO in paragraph 17 is accurate.

24. PEO's are provided in commercial grades by Dow, named PolyOx™ Water-Soluble Resins NF for Pharmaceutical Applications. PolyOx™ is the trade name for Dow's off-the-shelf PEO ingredients. There are 10 pharmaceutical grades of PolyOx. ™ Each grade has its own unique approximate molecular weight. Each grade has a WSR (Water-Soluble Resin) number associated with it. These grades are shown in the Dow brochure, Exhibit 2 as supplied in the claims construction brief 9/23/16. The grades are also listed in the Dow brochure "Polyox™ Water-Soluble Resins, NF in Pharmaceutical Applications" published 2004. I've attached additional examples as well. It is interesting to note that the Dow brochure which was published in 2004 has a footnote which states "the physical property data listed are considered to be typical properties, not specifications".

25. The specification of the '741, '988 and '987 identify the PEO used in the examples by its grade, naming the exact WSR product code. The specification does not include the formula used by Dr. Davis in paragraph 24. Neither do any of the claims.

26. As explained by Dow's literature, each grade of PolyOx™ is labeled with an approximate molecular weight based on rheological measurements. For example; WSR N-10 has an approximate molecular weight of 100,000 with a viscosity of 30-50 centipoise (cP) for a

5% solution at 25 degrees Centigrade using a Brookfield Viscometer (Model RVT) with a number 1 spindle at 50 RPM. Rheology is a branch of physics that studies the deformation and flow of matter. Dow's use of rheology is consistent with the patent claims, which also involve measuring approximate molecular weight based on rheological measurements. The patents use Dow's definition of molecular weight based on rheology. See '741 patent, col. 7: 50-col. 3: 26. In my view, rheology is not disputed for claim construction.

27. **Claims**: The claim language itself indicates the ingredients to be added to the formulation. To meet the claim, there must be an extended release matrix tablet comprising a combination of certain ingredients: (1) at least one PEO having, based on rheological measurements, an approximate molecular weight of 4,000,000, and (2) oxycodone or a pharmaceutically acceptable salt.

28. After identifying the ingredients required in the extended release tablet, the claim lists the amount of oxycodone or pharmaceutically acceptable salt as compared to the percentage weight of the at least one PEO having, based on rheological measurements, an approximate molecular weight of 4,000,000.

29. Importantly, (as explained in detail below) this calculation was specifically explained in the prosecution history of the '741 and '988 patents and a claim amendment was made so that the specification would support the claims. The key prosecution history sections are attached. The prosecution history shows the claimed weight percent is of only the PEO having the grade of 4,000,000. Dr. Davis entirely ignores the key examples from the specification and the sections of the prosecution history that are directly contrary to his opinion. *See, e.g.,* Davis para. 24-25.

30. The claims are also important for what they do not say.  The claims do not refer to an effective dose or rheological endpoint of PEO having an approximate molecular weight. The claims also do not refer to a combined weight average of all PEOs used to achieve the approximately 4,000,000 molecular weight, or any other weight listed in the claims.

31. **Specification** The specifications of each patent define the PEO "ingredient" used by its Dow commercial PolyOx™ grade along with its corresponding approximate molecular weight and the amount used by "mg/unit."  This is how the ingredients are measured in at least 25 examples in the specification.  See, e.g., Examples 1-25.

32. For example, in Example 4, each grade of PEO is listed as an ingredient by its Dow grade and its corresponding approximate molecular weight.  Example 4 lists PolyOx™ WSR 301 (MW: approximately 4,000,000), PolyOx™ N10 (MW: approximately 100,000), PolyOx™ N-60K (MW: approximately 2,000,000), and PolyOx™ WSR 303 (MW: approximately PEO at 7,000,000). Each PEO ingredient is listed by its WSR grade number and by the milligrams per unit in the tablet.  Although multiple grades of PEO are used as ingredients in a single composition, as shown in the examples in the specification, no averaging of the ingredients was done.

33. The specification is clear when averaging is done.  When averaging was done for various needs and reasons, it was called out as such in the specification. For example, the '741 specification notes that the following examples includes averaging aspects: Table 5.1-5.3, Table 7.1.2, Table 7.2.2, Table 7.3.2, Table 14.1.3, Table 14.1.4, Table 14.2.3, Table 14.2.4, Table 14.3.3, Table 14.3.4, Table 14.4.3, Table 14.4.4., Table 15.2.2, Table 27.2 (and Col. 155: 19-20), Table 27.4 (and Col. 156: 18-19). Table 27.5 (and Col. 156: 53-54), Table 27.6 (and Col. 157: 36-37), Table 27.10 (and Col. 159: 29-30).  Also,

Examples 4.2, 4.3, 5.3, 7.3, 8.2, and 25 in the '741, '988, and '987 patents contain at least 2 different grades of PEO and the approximate molecular weight is noted as being calculated based on each PEO's grade. None of the examples used averaging in view of using different grades of PEOs or of calculating average molecular weight consistent with Plaintiffs' proposed claim construction.

34. Example 25 is especially helpful in understanding the disputed claim term and in construing the "at least one" PEO having an approximate molecular weight as an ingredient in a Dow labeled-WSR grade. The specification and prosecution history teach me how to understand the claims.

35. Example 25 involves a tablet with two PEO ingredients having different approximate molecular weights and in different milligram quantity per tablet. The PEOs are listed as PolyOx™ WSR 301 at an approximate molecular weight of 4,000,000 and PolyOx™ WSR-N10 at an approximate molecular weight of 100,000.

36. Example 25 is shown below:

## EXAMPLE 25

In Example 25, two different 400 mg tablets including 60 mg (Example 25.1 and 25.2) and 80 mg (Example 25.3 and 25.4) of oxycodone HCl were prepared using high molecular weight polyethylene oxide and low molecular weight polyethylene oxide. Two 100 kg batches were prepared for each formulation.

| | Example 25 | | | |
|---|---|---|---|---|
| Ingredient | mg/unit | | mg/unit | |
| Oxycodone HCl | 60 | | 80 | |
| Polyethylene oxide (MW: approximately 4,000,000; Polyox ™ WSR-301) | 229.7 | | 216 | |
| Polyethylene oxide (MW: approximately 100,000; Polyox ™ WSR-N10) | 106.3 | | 100 | |
| Magnesium Stearate | 4 | | 4 | |
| Total Core Tablet Weight (mg) | 400 | | 400 | |
| Example | 25.1 | 25.2 | 25.3 | 25.4 |
| Total Batch size | 100 kg | 100 kg | 100 kg | 100 kg |
| Coating | mg/unit | | mg/unit | |
| Opadry film coating | 16 | | 16 | |
| Total Tablet Weight (mg) | 416 | | 416 | |
| Example | 25.1 | 25.2 | 25.3 | 25.4 |
| Coating Batch Size (kg) | 91.440 | 96.307 | 95.568 | 98.924 |

37. **Prosecution History:** During prosecution of the applications leading to the '741 and '988 patents, the Examiner "asked for citations to Examples and data in the Specification showing the percent of PEO in relationship to the dose amount of active agent (e.g., oxycodone or its pharmaceutically acceptable salt) and results, particularly for doses of 40, 60, and 80 mg."

38. Applicant responded by amending the claims and citing examples to support the percent of PEO in relationship to the dose amount of active agent.  Naming supporting examples, applicant states that "the claims have been amended to specify: (i) 5, 7.5, 10, 15, 20, or 30 mg of oxycodone or pharmaceutically acceptable salt and at least 79% PEO (e.g.

Example 27); (ii) 40 mg oxycodone or its salt and at least 72% PEO (e.g. Examples 13.5 and 14.5); (iii) 60 mg oxycodone or its salt and at least 57% PEO (e.g. Example 25); or (iv) 80 mg oxycodone or its salt and at least 54% PEO (e.g. Example 25)."

39. Stating that the "new and amended claims concerning dose and weight percent of PEO correspond to disclosures in the Examples," and citing Example 25, applicant amended the claims as shown in bold below: "at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of **4,000,000** . . . and (iii) 60 mg of said oxycodone or pharmaceutically acceptable salt and at least **57%** by weight, based upon the total weight of said composition, of said at least one polyethylene oxide having, based on rheological measurements, an approximate weight of **4,000,000 or (iv) 80 mg of said oxycodone or pharmaceutically acceptable salt and at least 54% by weight, based upon the total weight of said composition, of said at least one polyethylene oxide having, based on rheological measurements, an approximate weight of 4,000,000."** *See* attached excerpts of prosecution history of '741 and '988.

40. For 60 mg and 80 mg tablets, applicant identifies Example 25. Example 25 uses two different grades of PEO as ingredients of the tablet: WSR-301 (MW: approximately 4,000,000) and WSR-N10 (MW: approximately 100,000).

41. Using Example 25 to calculate the percentage of each PEO component confirms that for the 60 mg tablet, the claim amendment referring to 57% by weight of said at least one PEO of an approximate molecular weight of 4,000,000 refers only to *one* specific grade of PEO – namely the WSR-301 (4,000,000 approximate molecular weight). The 57% represents the amount of the PEO of approximately 4,000,000 (WSR-301) molecular weight in the formula.

42. This same analysis applies to the 80 mg tablet.  For the 80 mg tablet, the 54% weight relates only to the PEO of approximately 4,000,000 – namely the WSR-301. My calculations for the examples are included herein.

43. Using the data shown in Example 25 for the 60 and 80 mg example, the applicant must have used the following formula to obtain the percentages used to amend and support the claims:

**Example 25:** 4,000,000 PEO (WSR-301)/ total core tablet weight (mg/unit)

60 mg strength:        229.7 mg divided by 400 mg = .57  .57 times 100 = 57% by weight

80 mg strength:         216 mg divided by 400 mg = .54.  .54 times 100 = 54% by weight

44. In order to ensure complete weight balance, I calculated the weight percent of each ingredient in the 60 and 80 mg tablets:

60 mg:

| | |
|---|---|
| Oxycodone: | 15% |
| WSR-301 (PEO of 4,000,000) | 57.4% |
| WSR-N10 (PEO of 100,000) | 26.6% |
| Magnesium Stearate | 1% |
| | 100% |

80 mg:

| | |
|---|---|
| Oxycodone: | 20% |
| WSR-301 (PEO of 4,000,000) | 54% |
| WSR-N10 (PEO of 100,000) | 25% |
| Magnesium Stearate | 1% |
| | 100% |

45. The claim amendment and remarks show the intent and purpose of the claim was *only* to claim the weight percent of the one grade of PEO at an approximate molecular weight of 4,000,000, and not to do a combined weight average of the multiple PEO ingredients.

46. Dr. Davis uses a formula in paragraph 24. His example involves 20% PolyOx WSR N-12k and 60% PolyOx 5,000,000. He says the "total amount of PEO in the dosage form would be 80% (20% + 60%) by weight." This shows he added both PEOs for the weight percent.

47. Applying his formula to Example 25, he would add both PEOs. This means, for 60 mg, adding 57.4% and 26.6% for a total of 84% PEO. Although 84% is more than the claimed 57%, under Dr. Davis' analysis the "new and amended claims concerning dose and weight percent of PEO" at 57% would **not** "correspond to disclosures in the Examples" and would be contrary to the applicant's statements during prosecution. In other words, using Dr. Davis's claim construction approach (a combined weight average for the PEO ingredients) means that the amendment would not be supported for weight percentages between 57-84%. Using his proposed claim construction, the claim, as amended and based on the named support from the specification, is supported only starting at a PEO weight percent of 84%. Using Plaintiff's claim construction the applicant's statements to the Examiner would not be true and the claim would be invalid for indefiniteness since the specification would not support the claim.

48. The discussion in paragraph 34 in Dr. Davis's declaration is generally correct as to how to calculate a weight average molecular weight for a mixture of two grades on PEO. While this is correct it doesn't address the claim amendment and remarks which clearly

state the composition of the desired core formulations contain 57% of WSR 301 for the 60mg dose and 54% for the 80mg dose.  The 57% and 54% respectively are the amounts of the WSR 301 PEO in each formulation. My calculations are based on percent/mg. per dosage form and not on a combined weight average molecular weight of all PEOs as discussed by Dr. Davis.

49. In addition, Dr. Davis fails to account for the fact that the patents (for example, '741 patent at col. 7:ll.44-67 and col. 8:ll.1-30) describe PEO as separated mainly into two groups: "high molecular weight PEO" and "low molecular weight PEO" in which each PEO is defined by its "approximate molecular weight" grade (using Dow's WSR product codes).  Dr. Davis does not address the fact that there is no mention in the patents about use of mixture of two or more grades of PEO in order to get the claimed "approximate molecular weight" of 4,000,000 needed to practice the claimed invention.  There are examples, however, using multiple PEO grades (Examples 4.2, 4.3, 5.3, 7.3, 8.2, and 25) but each PEO is used by an amount (mg/tablet) of that specific grade and its associated molecular weight. There is no discussion of an averaging of the molecular weight since the formulations are based on mg amounts used and not the rheological endpoints. The example is clear in that several grades are used but is silent about the associated rheology. This is yet another reason why a POSA would understand that the approximate molecular weight in the claim language correlates with each grade of PEO.

50. Based on my review, the claims and specification do not include a formula for "a combined weight average molecular weight" for blended PEOs.  And, no such formula is supported by the claims, specification, or prosecution history.

51. Based on the specification and prosecution history, since the claims require an ingredient of at least one polyethylene oxide, based on rheological measurements, having a molecular weight of approximately 4,000,000, I would understand the claims as requiring use of one or more PEO having an approximate molecule weight of 4,000,000, which Dow markets as WSR-301.

52. Based on Example 25 and the amended weight percent, this means that the same disputed phrase used earlier in the claim (highlighted in yellow above) must also refer to the same PEO – namely a PEO ingredient having the grade of approximately 4,000,000.  In other words, the same phrase used in the same claim means the same thing.

53. Dr. Davis raises other points as well in hopes of supporting Purdue's claim construction of: "one or more polyethylene oxides having a combined weight average molecular weight of approximately 4,000,000 Daltons based on rheological measurements."  None of them are helpful in construing the claims.

54. First, Purdue's claim construction would broaden the claims and define the claims based on a rheological endpoint or an effective dose of PEO– not the approximate molecular weight of the ingredients used.  This is a significant broadening of the claims and I fail to see how such a construction would be justified by the claims, specification, and prosecution history.

55. For example, in paragraphs 33 and 34 of his declaration, Dr. Davis relies on claim 54 of the '987 patent as support for his position. Dr. Davis's reliance on claim 54 is misplaced.

56. Claim 54 of the '987 patent refers back to independent claim 38.  Claim 38 requires "at least one" PEO of "a molecular weight of approximately 4,000,000 and is at least 79% by weight of the composition."  Claim 54 reads in full as follows:

54.     The process of claim 38, wherein the composition comprises at least one polyethylene oxide having, based on rheological measurements, a molecular weight of at least 1,000,000 and at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000, wherein the composition comprises at least 10% (by wt.) of **the** polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000.

57. Claim 54 specifically identifies the required PEO needed based on each PEOs ingredient grade. This is consistent with my interpretation of the independent claims. Claim 54 requires at least one PEO having a molecular weight above 1,000,000 (referring to ingredient grade above 1,000,000) and at least one PEO having an approximate molecular weight of less than 1,000,000 (referring to ingredient grade less than 1,000,000). Dr. Davis appears to agree that claim 54 refers to at least two different PEO ingredient grades. Claim 54 uses the same language at issue in the other claims – "at least one" and "approximate molecular weight." This supports my view that one skilled in the art would understand this same language as used throughout the claims as referring to an ingredient grade, not as a combined weight average of all PEO grades as asserted by Dr. Davis.

58. Claim 54 also requires a certain weight amount (at least 10% by weight) of the at least one PEO ingredient having an approximate molecular weight of less than 1,000,000. The claim shows this applies only to the ingredient grade of less than 1,000,000. This supports my view that the "at least one" PEO having an "approximate molecular weight" of 4,000,000 (or more than/less than 1,000,000) is defined on an individual grade basis – not as an "overall molecular weight" of the PEOs in the claim.

59. Furthermore, claim 38 requires "at least 79% by weight of the composition" of the "at least one polyethylene oxide has, based on rheological measurements, a molecular weight of approximately 4,000,000." As shown by the prosecution history for the '741 and '988 patents, this weight percent is calculated on an ingredient level of only the at least one

PEO ingredient having 4,000,000 Dow ingredient grade.  This is consistent with claim 54, which also calculates the weight percent of a certain PEO on an ingredient level.

60. Dr. Davis appears to construe the key phrases (at least one and approximate molecular weight) in claim 54 differently than in claim 38 based only on the word choice of "comprising" as compared to the words "further comprising."  The claims as read with the specification and prosecution history show this is improper and provide evidence to the contrary.

61.  Claim 1 and 54 suggest to me that I would select the desired PEO using the grades available from the supplier (Dow) to meet the selection requirement and weight percentage for each PEO ingredient as noted in the claim.

62. Next, Dr. Davis is incorrect to argue that more than one PEO of an approximate weight of 4,000,000 could not be used because there is only one commercial manufacturer of WSR-301.  Davis para. 32. Dr. Davis misses the point that the formulation may identify different amounts of the same ingredient for different uses in order to form a certain type of tablet – and that if other brands become available the claims are not limited to only Dow's product.

63. For example, in a formulation, the ingredients used may include more than one PEO having an approximate molecular weight of 4,000,000.  As disclosed in the specification, a formulation may involve use of a bi-layered tablet. '741 patent, col. 34: line 58-col. 35: line 27.  While this example discusses an osmotic dosage form wherein there is an active layer and a push layer, there are other conventional applications and examples in the art of using the same component (PEO having an approximate weight of 4,000,000) in two different applications within the same dosage form.  More specifically the PEO having an

approximate weight of 4,000,000 may be used intra-granular and extra-granular. In this case the intra-granular would be included as part of the "massing" process. Meaning it is added during the formation of the granulation which is one step in achieving the final desired granulation. The extra-granular addition of the second portion of the PEO having an approximate weight of 4,000,000 would take place during the final blending of the granules with the required "running" powders this is another step in the process for achieving the final desired granulation. These two additions take place during two separate process steps in the preparation of the final granules, which are to be formed into a sustained release tablet.  The rationale for using PEO in this manner resides in the nature of the dissolution process of the sustained release tablet. The gelling properties of the extra-granular materials would react immediately, as opposed to the slower gelling of intra-granular PEO when incorporated within the dosage form. This slower intra-granular gelling of the PEO is a function of the physical location of the PEO within the granules. While the faster gelling of the extra-granular PEO is a function of its physical location outside of the formed granules which contain the intra-granular PEO.  Depending upon the desired dissolution profile the aforementioned granules could also be used to create the layers of a conventional bi-layer dosage form.  In such situations, there may be a need to use more than one PEO having an approximate molecular weight of 4,000,000 in a tablet.

64. Lastly, Dr. Davis refers to the usage of plural form of PEO one time in the specification as being relevant.  Davis para. 36.  The context shows the plural was referring to the multiple grades of PEO discussed in the preceding sentences, which appear to be cut and pasted and then repeated.

65. Also, I find the prosecution history explaining the invention as important. The prosecution history shows that the applicant told the Examiner that the claims relate to "a polyethylene oxide (PEO) having **a** relatively high molecular weight." PAMN59363. This Remark section reads as follows: "All of the claims provide at least a method for treating pain comprising administration of a cured composition comprising an active agent (an opioid analgesic) and a polyethylene oxide (PEO) having a relatively high molecular weight (generally at least about 1,000,000)."

66. After these Remarks were submitted, the applicant amended the claims as follows: "at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of ~~at least 1,000,000~~ 4,000,000." PAMN59483. The same language was amended for the claimed weight percentages of the PEO for each mg tablet. These prosecution history sections show further evidence that the applicant narrowed the claim to one (or more than one) PEO ingredient grade of an approximate molecular weight of 4,000,000.

## V.    Conclusion

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that all statements made are of my own knowledge, my statements are true and are made on information and belief that I believe are also true. I understand that willful false statements are punishable by fine or imprisonment or both under 18 U.S.C. section 1001.

Dated: October, _19_, 2016          _Russ Somma_

Russ Somma, Ph.D.

**ADDENDUM**

**Calculations Supporting Amendment of Claims For:**

**"and at least [*see claim*]% by weight, based upon the total weight of said composition, of said at least one polyethylene oxide having, based on rheological measurements, an approximate molecular weight of 4,000,000"**

Dosages 5, 7.5, 10, 15, 20, or 30 & Example 27 to support claim amendment of at least 79% PEO:

> Example 27 refers to Examples 7.2 and 14.2-14.4.

> Example 7.2 = 92%

> Example 14.2= 89%

> Example 14.3 = 85.6%

> Example 14.4 = 79%

Dosage of 40 mg & Example 13.5 and 14.5 to support claim amendment of at least 72% PEO:

> Example 13.5 = 72%

> Example 14.5 = 72%

Dosage of 60 mg & Example 25 to support at least 57% PEO:

> Ex. 25 at 60 mg: 57%

Dosage of 80 mg & Example 25 to support at least 54% PEO:

> Ex. 25 at 80 mg: 54%

Attachments:

1. Dow brochures

2. Prosecution History Excerpts from '741 patent

3. Prosecution History Excerpts from '988 patent

## <u>CERTIFICATE OF SERVICE</u>

I, Anne Shea Gaza, Esquire, hereby certify that on October 21, 2016, I caused to be

electronically filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

> Jack B. Blumenfeld
> Rodger D. Smith II
> MORRIS NICHOLS ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> *jblumenfeld@mnat.com*
> *rsmith@mnat.com*
>
> *Attorneys for Plaintiffs*

I further certify that on October 21, 2016, I caused a copy of the foregoing document to

be served by e-mail on the above-listed counsel and on the following:

> John J. Normile
> Kelsey I. Nix
> Gasper J. LaRosa
> Pablo D. Hendler
> Kenneth S. Canfield
> Lisamarie LoGiudice
> Sarah A. Geers
> JONES DAY
> 250 Vesey Street
> New York, NY 10281-1047
> *jjnormile@jonesday.com*
> *knix@jonesday.com*
> *gjlarosa@jonesday.com*
> *phendler@jonesday.com*
> *kcanfield@jonesday.com*
> *llogiudice@jonesday.com*
> *sgeers@jonesday.com*

Jason G. Winchester
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
*jgwinchester@jonesday.com*

*Attorneys for Plaintiffs Purdue Pharma L.P., Purdue Pharmaceuticals*
*L.P., The P.F. Laboratories, Inc., and Rhodes Technologies*

Joann M. Neth
Jennifer H. Roscetti
Anthony C. Tridico
Matthew J. Luneak
Erin M. Sommers
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
*joann.neth@finnegan.com*
*jennifer.roscetti@finnegan.com*
*anthony.tridico@finnegan.com*
*matthew.luneack@finnegan.com*
*erin.sommers@finnegan.com*

*Attorneys for Plaintiff Grünenthal GmbH*

Dated: October 21, 2016                    YOUNG CONAWAY STARGATT
                                             & TAYLOR, LLP

                                           */s/Anne Shea Gaza*
                                           Anne Shea Gaza (No. 4093)
                                           Samantha G. Wilson (No. 5816)
                                           Rodney Square
                                           1000 North King Street
                                           Wilmington, DE 19801
                                           (302) 571-6600
                                           agaza@ycst.com
                                           swilson@ycst.com
                                           *Attorneys for Defendant*
                                           *Amneal Pharmaceuticals LLC*

01:18188939.1

2