IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PURDUE PHARMA L.P., <br> PURDUE PHARMACEUTICALS L.P., <br> THE P.F. LABORATORIES, INC., <br> RHODES TECHNOLOGIES, and <br> GRÜNENTHAL GMBH, <br> <br> Plaintiffs, <br> <br> v. <br> <br> AMNEAL PHARMACEUTICALS, LLC, <br> <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 15-1152 (RGA) (SRF) <br> ) CONSOLIDATED <br> ) <br> ) REDACTED - PUBLIC VERSION <br> ) <br> ) <br> ) <br> ) |

**PURDUE'S *DAUBERT* MOTION TO EXCLUDE**
**CERTAIN TESTIMONY OF GARY MOLANDER PH.D.**

OF COUNSEL:

John J. Normile
Kelsey I. Nix
Gasper J. LaRosa
Pablo D. Hendler
Kenneth S. Canfield
Lisamarie LoGiudice
Sarah A. Geers
JONES DAY
250 Vesey Street
New York, NY 10281-1047
(212) 326-3777

Jason G. Winchester
JONES DAY
77 West Wacker Drive
Chicago, IL 60601

*Attorneys for Plaintiffs Purdue Pharma L.P.,*
*Purdue Pharmaceuticals L.P., The P.F.*
*Laboratories, Inc., and Rhodes Technologies*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mdellinger@mnat.com

*Attorneys for Plaintiffs*

Original Filing Date: March 12, 2018
Redacted Filing Date: March 19, 2018

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT .................................................................................................................. 2

    A. Legal Standard .................................................................................................... 2

    B. Dr. Molander Is Not Qualified To Testify As To Analytical Chemistry Methods Or Analyses ......................................................................................................... 4

    C. Dr. Molander's Testimony Is Not Based On Reliable Methods Or Principles, And Would Not Assist The Court .............................................................................. 7

III. CONCLUSION ............................................................................................................... 8

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Anderson v. Raymond Corp.*,
   340 F.3d 520 (8th Cir. 2003) ...................................................................................................4

*Daubert v. Merrell Dow Pharmas., Inc.*,
   509 U.S. 579 (1993) ............................................................................................................2, 3

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000) .................................................................................................3, 4

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ..................................................................................................................3

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) .......................................................................................................3

*In re TMI Litigation*,
   193 F.3d 613 (3d Cir. 1999) ............................................................................................2, 3, 7

*Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*,
   C.A. No. 07-127-LPS-MPT, 2014 WL 529983 (D. Del. Feb. 7, 2014) ................................4, 7

*Meganathan v. Signal Int'l L.L.C.*,
   No. 1:13-cv-497, 2015 WL 11109846 (E.D. Tex. Jun. 26, 2015) .............................................4

*Wonderland Nurserygoods Co., Ltd. v. Thorley Indus. LLC*,
   No. 2:13-cv-00387, 2015 WL 5021416 (W.D. Pa. Aug. 21, 2015) ..........................................7

**Rules and Statutes**

Fed. R. Evid. 702 ....................................................................................................................2, 3, 7

Plaintiffs Purdue Pharma L.P., The P.F. Laboratories, Inc., Purdue Pharmaceuticals L.P., and Rhodes Technologies ("Purdue") respectfully move this Court for an order barring Defendant Amneal Pharmaceuticals, LLC ("Amneal") from proffering the expert opinions of Gary Molander, Ph.D. regarding Dr. David Bugay's high performance liquid chromatography ("HPLC") analyses.[1]

## I. INTRODUCTION

In his opening expert report, Purdue's expert, Dr. David Bugay, described certain analytical testing (HPLC analyses) he conducted on oxycodone hydrochloride samples provided by Amneal and its supplier ▬▬▬. (*See* Ex. B, attached hereto.) Dr. Bugay is an expert in analytical chemistry, including HPLC, who describes his techniques and methodologies in detail in his report, referencing and applying the widely accepted United States Pharmacopeia ("USP") standards[2] to reach and validate his results. (*Id.* ¶¶ 29-42.) The results of his testing confirmed that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ one of the elements recited in the asserted claims of the '933 patent-in-suit. (*Id.* ¶¶ 42-43.)

In his rebuttal expert report, Amneal's expert Dr. Molander criticizes Dr. Bugay's HPLC analyses and the conclusions Dr. Bugay draws from those analyses. (Ex. A, pp. 20-105.) But, *by his own admission*, Dr. Molander is not an expert in HPLC analyses or, for that matter, analytical chemistry. Indeed, Dr. Molander not only testified that "I'm not an analytic chemist,"

---

[1] Dr. Molander's opinions concerning Dr. Bugay's HPLC analyses are set forth in Section II of Dr. Molander's December 21, 2017, Rebuttal Expert Report, as well as any exhibits relating to those sections. (*See* Ex. A, attached hereto.)

[2] The USP is a nearly 200 year-old non-profit scientific organization that sets industry "primary standards for ensuring quality in pharmaceutical development & manufacturing" based on independent, peer-reviewed laboratories. (*See* https://www.usp.org/reference-standards (last visited Mar. 12, 2018).)

but also testified that he "is *not an expert in HPLC*." It is not surprising, therefore, that he has never performed tests using USP standard methods, which are considered essential steps in approved drug manufacture.[3] Accordingly, Dr. Molander is not qualified to testify in the form of an opinion or otherwise to rebut Dr. Bugay, or to provide any other testimony relating to HPLC specifically or analytical chemistry generally. Dr. Molander's lay testimony will not help the Court to understand the issues in this litigation.

Further, Dr. Molander's rebuttal testimony is based solely on his *own interpretation* of and speculation about Dr. Bugay's results. Dr. Molander cites to *no* independent source or standard for his conclusions, but rather relies merely on his own "look at the numbers." But these "numbers" are the results of HPLC analyses, a field in which Dr. Molander has no expertise. For this additional reason, Dr. Molander's testimony is not based on reliable principles or methods and should be precluded under Federal Rule of Evidence 702.

## II. ARGUMENT

### A. Legal Standard

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert opinions. Under *Daubert*, this Court functions as a gatekeeper with respect to the screening of expert testimony, *see* 509 U.S. at 597; *In re TMI Litigation*, 193 F.3d 613, 663 (3d Cir. 1999), and may admit proposed testimony only if it is "supported by appropriate validation -- i.e., 'good grounds,' based on what is known." *Id.* "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony:

---

[3] "Under Federal law, a drug with a name recognized in USP–NF must comply with the current version of compendial standards deemed official by USP, or risk being deemed adulterated, misbranded, or both (FDCA 501(b) and 502(e)(3)(b); FDA regulations 21 CFR 299.5(a&b))." (*See* https://www.usp.org/frequently-asked-questions/usp-and-its-standards (last visited Mar. 12, 2018).)

qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (internal quotations omitted). Indeed, "[b]efore an expert witness may offer an opinion pursuant to Rule 702, he *must first be qualified* by virtue of specialized expertise." *Id.* (emphasis added).

As the Third Circuit has recognized, *Daubert* also requires the exclusion of an expert's opinions if the proponent of them fails to show that they are "reliable." Fed. R. Evid. 702 (requiring that expert testimony be "(c) … the product of reliable principles and methods" and that "(d) the expert has reliably applied the principles and methods to the facts of the case"). That is, the Court may admit Dr. Molander's testimony and opinions only if his *methodology* is sound, regardless of his conclusions. *See TMI*, 193 F.3d at 664 (allowing admission of expert testimony "so long as the *process or technique* [as opposed to the conclusion] the expert used in formulating the opinion is reliable") (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)) (emphasis and bracketed text in original). The Third Circuit has held that courts should consider several factors to determine whether an expert's methodology is reliable, including, *inter alia*: (a) "whether the method has been subject to peer review"; (b) the methodology's "known or potential rate of error"; (c) whether there are "standards controlling the technique's operation"; (d) "whether the method is generally accepted"; and (e) "the non-judicial uses to which the method has been put." *TMI*, 193 F.3d at 664-65; *Paoli*, 35 F.3d at 742 n.8.

Rule 702 also requires the exclusion of an expert's opinions where, as here, they do not "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. Although the *Daubert* inquiry focuses on methodology rather than conclusions, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### B. Dr. Molander Is Not Qualified To Testify As To Analytical Chemistry Methods Or Analyses

The Court should exclude any testimony from Dr. Molander regarding Dr. Bugay's HPLC analyses because Dr. Molander does not have the specialized expertise required to offer opinions regarding, at the very least, the proper implementation and performance of Dr. Bugay's methods and the interpretation of his results. *See Elcock*, 233 F.3d at 741. Indeed, as Dr. Molander has stated, "I'm not an analytic chemist" and "not an expert in HPLC." (*See* Ex. C (Molander 2013 Dep. Tr.) at 36:15-17; Ex. D (Molander 2018 Dep. Tr.) at 18:6-10; 210:19-25.)

This self-expressed inexperience in HPLC is disqualifying per se. Courts frequently grant motions to exclude testimony where purported experts admit their lack of experience in the relevant subject matter. *See Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003) (finding no abuse of discretion where district court struck testimony of witness who "admitted he was not an expert in the design or engineering of stand-up lift trucks" and had not been involved in such design before being engaged for the case); *Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, C.A. No. 07-127-LPS-MPT, 2014 WL 529983, at *5-6 (D. Del. Feb. 7, 2014) (expert "not qualified … to opine on the theory of operation or the design of magnetic brakes" because he admitted he was not an expert on that topic); *Meganathan v. Signal Int'l L.L.C.*, No. 1:13-cv-497, 2015 WL 11109846, at *3 (E.D. Tex. Jun. 26, 2015) (because witness admitted "he is 'not an expert in safety' … he is not qualified to render such opinions").

Dr. Molander's *curriculum vitae* ("CV") confirms his lack of expertise in HPLC or analytical chemistry. (Ex. E.) Nothing in his CV suggests any expertise or specialized experience in HPLC specifically or analytical chemistry more generally. Dr. Molander describes his experience as "generally relat[ing] to methods for synthesizing organic molecules" and

specifically to organoboron chemistry. (Ex. F, Molander Op. Rpt. ¶¶ 5-6.) Dr. Molander confirmed this during a 2013 deposition in which he described the fields in which he is an expert as "I would say if you ask the community, probably synthetic methods development and the development of new reactions." (Ex. C at 35:15-18.)

Dr. Molander further testified as to his limited experience with respect to analytical chemistry:

> Q. Have you ever developed any analytical technique?
>
> A. No, I'm not an analytical chemist.
>
> Q. Do you have expertise in analytical chemistry?
>
> A. Expertise? I mean, we use analytical tools, we use NMR, nuclear magnetic resonance spectroscopy. We use IR. We use mass spectrometry. We use HPLC routinely in the laboratory.
>
> Q. Do you consider yourself an expert in analytical chemistry?
>
> A. In the way that I don't specialize in those, I – I use the tools that are available.

(*Id.*, 36:15-37:5.) Notably, Dr. Molander's testimony concerning even the ordinary use of analytical techniques is described as "we," i.e., others in his laboratory. (*Id.*) Despite his laboratory's use of HPLC or other analytical techniques, he acknowledges that "I'm not an expert in HPLC." (Ex. D at 210:23.) For just as Dr. Molander's routine use of a motor vehicle does not make him an expert in automotive repair, use of HPLC in his lab does not make him an expert in that analytical technique.

Dr. Molander also testified that he had only the vaguest of familiarity with the USP (Ex. C at 37:9-38:12), notwithstanding its importance in, for example, setting standards and analytical techniques for the pharmaceutical industry, including the specific HPLC analyses he now criticizes. Accordingly, Dr. Molander does not have the education, experience, or training

to offer opinions concerning Dr. Bugay's implementation of that generally accepted HPLC technique.

More recently, in February 2018, Dr. Molander testified that there had been no "changes in [his] areas of expertise since [his] July 2013 deposition." (Ex. D at 18:2-8.) Although his "students run HPLCs every day," neither he nor his group develops any analytical methods or even seeks to follow the industry-followed USP standards. (*Id.* 18:11-19:16.) Moreover, in the three years since his prior deposition, Dr. Molander had not gained "any further understanding of the USP." (*Id.* at 19:17-20.) He had never "used an HPLC method published in the USP to quantitate impurity levels in an API." (*Id.* at 207:16-19.) And he was not familiar with conducting standard-deviation analysis in conjunction with HPLC methodology, which analysis is the foundation for Dr. Bugay's opinions and conclusions. (*Id.* 210:19-25.) Such specific knowledge, training, and experience – which Dr. Molander readily admits he lacks – is crucial to assisting the Court in understanding the evidence in this case.

Although Dr. Molander may be an expert in certain areas of chemical synthesis (i.e., making chemical compounds), that is a separate field of science from analytical chemistry, which is generally devoted to determining the content, structure, and quantity of matter in a composition. (*See, e.g.*, Ex. G (American Chemical Society, https://www.acs.org/content/acs/en/careers/college-to-career/areas-of-chemistry/analytical-chemistry.html) (last visited Mar. 12, 2018).) In contrast, Dr. Bugay has nearly 30 years of experience in analytical chemistry. (Ex. B ¶ 2.)

For the foregoing reasons, the Court should exclude any testimony proffered by Dr. Molander relating to HPLC, including Section II of his rebuttal expert report.

### C. Dr. Molander's Testimony Is Not Based On Reliable Methods Or Principles, And Would Not Assist The Court

The Court should further exclude Dr. Molander's testimony as to Dr. Bugay's analyses because his opinions and conclusions are not based on reliable methods or principles. Fed. R. Evid. 702(b)-(c); *TMI*, 193 F.3d at 664. Dr. Molander does not cite to *any* independent source or standard to support his conclusions that "[t]he HPLC method used … appears not to be a reliable, validated method" or that Dr. Bugay's conclusions were based on "inconsistencies and imprecision in the data." (*See* Ex. A ¶¶ 107-11.) Indeed, Dr. Molander relies only upon his own speculation regarding Dr. Bugay's analyses. (*See*, *e.g.*, *id.* ¶¶ 57-111.) He bases his primary conclusions of inaccuracy in Dr. Bugay's sample numbers solely upon his own "eyeball test" of their ranges, and not by any accepted variation analysis. (*Id.*; *see also* Ex. D at 212:14-22 ("Q: You cite no source for indicating that the range of results are unacceptable, do you? A: Correct. Q: You have no support for your conclusions? A: *I can look at the numbers*." (emphasis added).) Accordingly, none of Dr. Molander's conclusions has any independent foundation. *See Magnetar*, 2014 WL 529983, at *12 (striking expert report where expert "only provides data and a conclusion, with the chasm between not bridged by any analysis"); *Wonderland Nurserygoods Co., Ltd. v. Thorley Indus. LLC*, No. 2:13-cv-00387, 2015 WL 5021416, at *15 (W.D. Pa. Aug. 21, 2015) (rejecting expert testimony where witness "has offered no foundation or support for this opinion"). Certainly, one person's cursory "look at the numbers" is not a reliable method or "good grounds" for a conclusion, especially when compared to Dr. Bugay's scientifically recognized standard-deviation methods.

Further, as established above, Dr. Molander has no specialized experience in the field of analytical chemistry or familiarity with USP standards. He admitted that he was not an expert in HPLC, has never used an HPLC method published in the USP to quantitate impurities,

and did not use the standard-deviation analyses Dr. Bugay applied for his conclusions. Thus, he has no expertise to back up his opinions. All of his methods and conclusions are tainted by his lack of knowledge of, or skill in, the proper techniques and analyses. Thus, any testimony he may provide on this subject matter *cannot* help the Court.

### III. CONCLUSION

For the foregoing reasons, the Court should preclude Dr. Molander from testifying as to the above-mentioned non-infringement positions, including those mentioned in Section II of his rebuttal expert report.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mdellinger@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

John J. Normile
Kelsey I. Nix
Gasper J. LaRosa
Pablo D. Hendler
Kenneth S. Canfield
Lisamarie LoGiudice
Sarah A. Geers
JONES DAY
250 Vesey Street
New York, NY 10281-1047
(212) 326-3777

Jason G. Winchester
JONES DAY
77 West Wacker Drive
Chicago, IL 60601

*Attorneys for Plaintiffs Purdue Pharma L.P., Purdue Pharmaceuticals L.P., The P.F. Laboratories, Inc., and Rhodes Technologies*

March 12, 2018

## D. DEL. LR 7.1.1 CERTIFICATION

Plaintiffs hereby certify, pursuant to D. Del. LR 7.1.1, that they made a reasonable effort to reach agreement with Defendant on the matters set forth in this motion, including oral communication involving Delaware counsel, but were unable to reach agreement.

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PURDUE PHARMA L.P., <br> PURDUE PHARMACEUTICALS L.P., <br> THE P.F. LABORATORIES, INC., <br> RHODES TECHNOLOGIES, and <br> GRÜNENTHAL GMBH, <br><br>       Plaintiffs, <br><br> v. <br><br> AMNEAL PHARMACEUTICALS, LLC, <br><br>       Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 15-1152 (RGA) (SRF) <br> ) CONSOLIDATED <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## **[PROPOSED] ORDER**

WHEREAS, on March 12, 2018, Plaintiffs Purdue Pharma L.P., Purdue Pharmaceuticals L.P., The P.F. Laboratories, Inc., and Rhodes Technologies ("Plaintiffs") submitted a Motion to Exclude Certain Testimony of Gary Molander, Ph.D.;

WHEREAS, the parties have fully briefed the Court regarding the scope of Plaintiffs' desired relief, and the Court has reviewed and weighed the parties' arguments;

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' Motion to Exclude is **GRANTED**. Dr. Molander may not testify as to non-infringement positions included in Section II of his rebuttal expert report (pages 20-105), including his opinions as to Dr. Bugay's HPLC analyses.

SO ORDERED this ___ day of _____ 2018.

_____
UNITED STATES DISTRICT JUDGE